# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| **INFINITY FLUIDS CORP.,** ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | **NO. 14-40089-TSH** |
| ) | |
| ) | |
| ) | |
| **GENERAL DYNAMICS LAND SYSTEMS, INC.,** ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM OF DECISION
### September 29, 2016

**HILLMAN, D.J.**

### Background

Plaintiff, Infinity Fluids Corp., ("Plaintiff" or "Infinity") has filed claims against

Defendant, General Dynamics Land Systems, Inc. ("Defendant" or "GDLS")  alleging claims for

Breach of Contract (Count I), Unjust Enrichment (Count II), Misappropriation or Misuse of

Trade Secret Information (Count III), Misappropriation of Confidential Information (Count IV),

violations of the Massachusetts Consumer Protection Act, Mass.Gen.L. ch. 93A ("Chapter 93A")

(Count V), and Negligent Misrepresentation in violation of Chapter 93A (Count VI), Negligent

Misrepresentation (Count VII), Fraudulent Misrepresentation in violation of Chapter 93A (Count

VIII), and Fraud and Deceit (Count IX), This Memorandum of Decision addresses Defendant's

Motion For Summary Judgment (Docket No. 118).  For the reasons set forth below, that motion is *granted*, in part and *denied*, in part.

## Facts

GDLS is a defense contractor that designs and manufactures various types of armored combat vehicles for the United States Military.  In the late 1990's, GDLS contracted with the United States Marines ("Marines") to develop an armored amphibious tank capable of being launched from a ship at sea, eventually named the Expeditionary Fighting Vehicle ("EFV").   In connection with development of the EFV, in 2008 GDLS was awarded a $700 million cost-plus-incentive fee contract with the Marines, which scope of work included continuation of system development and demonstration for the EFV, as well as the manufacture of seven fully-equipped prototype vehicles for the Marines for testing ("EVF Program"). GDLS encountered difficulty with the EFV's ability to start in cold weather conditions. In April 2008, GDLS performed a trade study to resolve the cold start functionality issue.  The study concluded that an electric heater would be the best option to resolve the cold start issue.

In 2008, GDLS solicited vendors for component parts that could be incorporated into the final design of the EFV.  Infinity was one such vendor. Infinity claimed to be able to research, design and sell to GDLS an electric heater that could assist in warming the engine's coolant fluid prior to starting the engine in cold temperatures.  On May 8, 2008, GDLS and Infinity signed a Proprietary Data Agreement ("PDA") to govern their exchange of proprietary information in connection with development of the EFV. The PDA states that it is intended to allow the parties to exchange proprietary information in contemplation of a business arrangement between them.

The PDA expressly states that the parties:

intend to exchange information to support [GDLS] on the Expeditionary Fighting Vehicle ('EFV') and the MK46 Weapon Station …, and wish to protect the

2

confidentiality of certain Proprietary Information (as herein defined) disclosed in furtherance thereof.

…

1      The term Proprietary Information includes all information, in whatever form or medium previously provided or provided in connection this Agreement which is identified as proprietary by the disclosing party as follows: (i) written documents and permanent records are to be marked with a restrictive legend of the disclosing party such as "proprietary", "confidential" or the like and (ii) oral or visual information shall be identified as proprietary at the time of disclosure and so confirmed in writing within thirty (30) days of the presentation, such writing to contain a restrictive legend and a summary of the Proprietary Information delivered at the oral or visual presentation.

Notwithstanding the foregoing, this Agreement does not restrict disclosure or use of any information which would otherwise be considered "Proprietary Information" if the receiving party can demonstrate: (a) the information is published or generally known by the public (other than as a result of the breach of this Agreement); (b) the information was known by the receiving party at the time of disclosure as evidenced by competent proof; (c) the information has become lawfully available to the receiving party from a third party without restriction on disclosure; (d) the disclosing party approved in writing the public release by the receiving party; (e) the information was developed or discovered by the receiving party without access to or use of any Proprietary Information provided by the disclosing party; (f) the protection period has expired;  or (g) the information was required to be released pursuant to applicable law, governmental regulation, legal order, notice, subpoena, investigative demand or similar directive provided that the receiving party first, to the extent permitted by law gives the disclosing party sufficient notice to provide it with a reasonable opportunity to seek injunctive or other similar equitable relief to prevent disclosure or to obtain a protective order to govern such disclosure.

…

3.     Each party agrees: (i) to use the other's Proprietary Information solely for purposes of the [EVF] Program; (ii) not to disclose or reveal to any third party without the disclosing party's prior written consent, any portion of the disclosing party's Proprietary Information or any notes, summaries, or other information derived

3

> from the Proprietary Information; (iii) to disclose Proprietary
> Information of the disclosing party or portions thereof only to
> those employees, contract employees, or other agents or
> representatives of the receiving party who need to know such
> information in confidence under terms and conditions at least as
> restrictive as the terms and condition of this Agreement and; and
> (iv) not to use any portion of the disclosing party's Proprietary
> Information for personal gain or to advance or support the
> reviewing party's other business ventures or the business ventures
> of others

The PDA explicitly permits the use of Proprietary Information (as defined therein) by the parties in connection with the EVF Program. Infinity's President, Robert Evans ("Evans") signed the PDA on behalf of Infinity; he read and understood it at the time he signed it.  Evans understood that GDLS was engaged in developing the EFV for the Marines, and that the PDA was entered in order to govern the parties' exchange of information related to the EVF Program. It was also Evans' understanding that the confidential information which Infinity would be providing to GDLS wasn't going "to [be] share[d] with anyone else beyond the project" and that Infinity's Proprietary Information could not be disclosed to third parties without its consent. Infinity did not provide any confidential business information or trade secrets to GDLS prior to entering the PDA.  After entering the PDA, Infinity labeled confidential information provided to GDLS "proprietary" and sent emails indicating that the technology and or information included therewith contained Proprietary Information.

Infinity was considered to have a viable, preferred solution because its heater could reside within the EFV. The product proposed by Infinity was a pre-existing marketable product known as the CENTAX Heater, which Infinity planned to redesign to meet the needs of the EVF Program.  Infinity was going to have to make substantial changes to customize the CENTAX design in order to meet GDLS's needs. Infinity's heater solution and technology contained valuable trade secrets and confidential information including: (1) custom product design which

was capable of meeting GDLS's technical requirements at a size and weight which allowed it to reside onboard the EFV; (2) custom product geometry including element transition/termination, ring design, bus bar configuration, terminal locations, stand-off materials, insulators, and heat transfer design; (3) custom saddle termination design; and (4) custom testing equipment and protocols designed for testing of Infinity's GDLS heaters, including equipment and protocols used for measurements of temperature, flow rate, resistance, power, *etc*. Evans spent years perfecting the CENTAX heater and Infinity's business depends upon its unique heaters and the trade secrets they contain. Sales are driven by the inherent benefits of its products and intellectual property. For that reason, Infinity took steps to protect its trade secrets and confidential information: It marks documents containing trade secrets as confidential, maintains computer security, and only provides access to its secret information to individuals with a reasonable need to know.  Additionally, Infinity limits the dissemination of its confidential or proprietary information to third parties by entering into non-disclosure agreements such as the PDA.

Infinity's intention was to sell heater units to GDLS on a per-item price basis.[1]  On February 24, 2009, GDLS submitted a purchase order ("Purchase Order #40034755") to Infinity for seven of its heater assemblies at $6,840 each.  Purchase Order #40034755 was later revised to include $38,679 in non-recurring engineering and tooling costs claimed by Infinity to be necessary in redesigning its CENTAX heater to meet the requirements of the EFV Program (because building the heater for GDLS required Infinity to re-design its standard CENTAX

---

[1] Infinity disputes this fact and states that it also expected to be paid on a per hour basis.  In support of this contention, it cites to Evans' deposition testimony. However, when asked if GDLS ever told Infinity it would pay by the hour, Evans responded "I don't recall that."  He further testified that he expressly told GDLS what the hourly rate would be in "quotations" (presumably referring to purchase orders). However, the two purchase orders between the parties, discussed *infra*, did not include an hourly rate quote.  Since Infinity has not cited to any evidence in the record which would support its contention that it was to be paid an hourly rate, I find GDLS' assertion that Infinity was to be paid by the piece to be undisputed.

heater, Infinity had to purchase additional equipment and spend time developing a heater that would meet GDLS's specifications).  This one time engineering and tooling cost was paid in full on April 2, 2009.

Purchase Order #40034755 explicitly incorporates the Purchase Order Terms and Conditions ("Terms and Conditions"). The Terms and Conditions expressly provide that:

> any acceptance by Seller on purported terms and conditions that differ in any way from the provisions of the Contract [as defined herein]. . . shall not become part of, or in any way alter, amend or otherwise modify any of the provisions of, the Contract. Any shipment of goods, performance of services, or commencement of work on supplies by Seller shall be deemed to be only upon the terms and conditions contained in the Contract, except to the extent that Buyer may otherwise expressly consent in a writing signed by the representative (or his/her successor) of Buyer who signed  [Purchase Order #40034755].

Evans understood that Purchase Order #40034755 represented the scope of what GDLS agreed to pay Infinity.[2]

Infinity acknowledges that at the time GDLS submitted Purchase Order #40034755, it did not have a functioning product that met the requirements of the EFV Program. The reason for the product's failure is disputed.  Since the EFV was in a redesign phase when GDLS and Infinity began working together, the engine compartment of the EFV was already populated with components.  Infinity's heater needed to be bent into a complicated pattern in order to be inserted into the engine's existing void space. Infinity produced heaters which although otherwise meeting GDLS's technical specifications, could not be bent to the desired redesign geometry (which would allow them to fit into the limited space) without breaking.  According to Infinity, GDLS told Infinity to manufacture its heater and that GDLS would locate a pipe bender capable

---

[2] On several occasions, including with respect to GDLS's factual assertions in this paragraph, Infinity has denied the truthfulness of the assertion and provided an explanation for its objection. However, the factual assertions by GDLS are supported by the evidence cited by it and are not *contradicted* or undermined by Infinity's objections. In many of these instances, it is not clear to the Court whether Infinity has misread GLDS's factual assertions, or whether it is making irrelevant and obtuse objections in hopes the Court will find a disputed issue without regard to content of the objection.  In these instances, the Court has found GDLS's assertions to be undisputed.

of twisting and turning Infinity's heater to fit the EFV engine.  GDLS provided Infinity with the

names of possible pipe vendors.  According to GDLS, while it may have identified potential pipe

vendors who could assist Infinity in bending the heaters, it was ultimately Infinity's

responsibility to bend the heaters.

GDLS continued to work with Infinity to develop a functioning product, and the parties

continued to exchange information in connection with this effort.   On July 15, 2009, GDLS

issued a second purchase order **(**"Purchase Order #40055319" and together with Purchase Order

#40034755m "Purchase Orders"**)** to Infinity for two CENTAX heater "test bed" prototype units

at $6,678 each, totaling $13,356.  GDLS paid Infinity in full for these additional prototypes upon

delivery, despite the fact that testing of the prototypes was ultimately unsuccessful.  GDLS

Purchase Order #40034755, for seven of Infinity's heater assemblies at $6,840 each, was

cancelled in late August 2009.  GLDS did not pay Infinity for the prototypes and did not

negotiate with Infinity as to their price despite requests from Infinity to do so. GDLS also

requested that Infinity perform work outside of the Purchase Orders and that Infinity purchase

and/or expedite equipment.  Infinity performed this work and purchased equipment related to

GDLS's heater outside of the Purchase Orders. Infinity assumed it was going to be reimbursed

for its costs and paid for its work and it requested payment for the work performed outside the

scope of the Purchase Orders[3]. Infinity was never compensated for this work.

Unbeknownst to Infinity, after GDLS received the prototypes under Purchase Order

#40055319, GDLS sent those components to a third party, Marvin Land Systems ("MLS"), for

---

[3] Infinity asserts that it purchased the extra equipment and did the work on based on "promises and
statements by GDLS employees." Infinity cites to Evans' deposition testimony to support this factual assertion.
However, Evans does not state that any GDLS employee ever promised to reimburse Infinity or stated that Infinity
would be reimbursed for such work/expenditures.  Instead, Evans testified that he *assumed* Infinity would be
reimbursed because it would not have done the work or made the purchases if it were not being reimbursed.

testing.  MLS was allowed to receive, evaluate and test proprietary heater technology from

Infinity, without Infinity's knowledge. GDLS visited Infinity's facilities with two engineers in

late September/early October 2009 after the closing date of the Purchase Orders to monitor

testing.  During this visit and shortly afterward, GDLS continued asking Infinity detailed

questions pertaining to the implementation of its technology. This testing was work that was

performed outside of the Purchase Orders.

After GDLS left Infinity's facility in October, GDLS indicated that Infinity had "all but

solved the problem." During this visit, GDLS employees took pictures of Infinity's confidential

and trade secret information, asked Evans questions pertaining to vendors, methods used in

manufacturing and internal construction of the heaters, and took copious notes on all aspects of

their operation. Infinity provided GDLS with pictures, vendor contacts and material data sheets.

Based upon their activities in visiting his facilities, Evans believed that GDLS was still working

with Infinity.  Infinity did not know that while it was providing GDLS with its Proprietary

Information, GDLS had been asking other vendors – include Temp, Inc. and Dayton T. Brown --

to copy Infinity's technology.  Moreover, GDLS sent out requests for bids which contained

Infinity's confidential information and/or trade secrets, including diagrams, explaining how to

build Infinity's confidential technology.  After GDLS's October of 2009 visit, and without a

purchase order in place, GDLS continued to communicate with Infinity regarding Infinity's

technology leading Infinity to believe it was still an active vendor.

In January of 2010, Infinity provided additional proprietary technology to GDLS concerning a different heater concept that GDLS was considering.  GDLS then produced a new design "Inline Heater," incorporating Infinity's proprietary technology, which included a specialized design only employed by Infinity, which was an unseen heater termination concept in the industry.  When Infinity offered its new concept heater formally to GDLS, GDLS responded by asking detailed technical questions and seeking advice on the internal construction of the unit proposed by Infinity. GDLS then created a similar design labeled "Element in Tube."  In August of 2010, GDLS submitted a Request For Information ("RFI") for a new heater to Infinity and no less than 10 other manufacturers/competitors including Vulcan Electric and MLS.  Infinity submitted a bid on GDLS's latest RFI for the heater (known as the Resistive Heater Unit or RHU). The RFI appeared to provide engineers instructions for creating Infinity's proprietary technology.

GDLS notified the Marines that Infinity was unable to deliver a workable product and requested permission from the Marines to install a temporary manufacturing aid in place of the inline heater in the EFV while GDLS continued to search for a workable solution.  In February 2010 GDLS initiated a "Heater Concept Trade Study" (the "Trade Study") to evaluate the requirements and identify a workable product to assist in the EFV's cold start functionality. GDLS's product change proposal initiating the Trade Study specifically referenced the pending deviation request to the Marines: "Currently, the SDD2 vehicles are built with a manufacturing aide (fluid tube in place of the heater) released under EFV-2257; this supports all requirements of the SHS except for the cold start requirement. There is currently a deviation under review to allow this requirement to be waived until release of the new heater component(s)."  On March 4, 2010, the Marines approved the deviation request, temporarily waiving the cold start requirement

while GDLS attempted to identify a workable solution. In conjunction with this deviation, the Marines and GDLS jointly developed and agreed upon a plan to: reexamine the requirements for the heating system; conduct a Trade Study to determine the best concept for development and design of the concept; build a prototype to support needed testing; and retrofit the EFV prototypes with the proven design in time to support cold weather testing, which at that time was scheduled for 2012. In December 2010, the Trade Study recommended a "heat trace" solution developed by Clayborn Lab ("Clayborn") for further concept design and development.

In 2010-2011, GDLS contracted with Clayborn to work on the EFV's heater technology. In 2010, Clayborn's existing heater technology could not handle GDLS's specifications for the EFV.  Prior to working with GDLS, Clayborn indicated that the closest it came to providing the watt density required for GDLS was in its design for the "Space Systems Loral."  However, the Space Systems Loral required a much lower watt density.  GDLS shared Infinity's trade secret information with Clayborn so that Clayborn could construct a heater capable of meeting GDLS's specifications.  Examples include GDLS's step by step instructions to Clayborn to reproduce Infinity's technology immediately following failures of the Clayborn product. Since Clayborn also had no experience designing heaters utilizing high amperage and ultralow resistance, GDLS had to explain Infinity's proprietary connector technology to Clayborn, including the design and materials employed in Infinity's lug concept. Infinity also designed a test bench and created a testing protocol used by GDLS in testing Infinity's proprietary technology for Clayborn.  GDLS used Infinity's exact testing design and protocols to test Clayborn's heaters.  The exact equipment Infinity specified to GDLS was also divulged to Clayborn by GDLS. Clayborn's design also appropriated Infinity's application of the "mica dielectric standoff," the "buss bar

ring," combining elements, the entries and exists of the conductors, and the mechanical application of the terminals and conductor lugs.

In January 2011, Secretary of Defense Robert M. Gates, announced the cancellation of the entire EFV Program. Because the EFV Program has been cancelled, no EFV units have ever been sold to the Marines.  It is undisputed that GDLS has never sold any heater assemblies researched during the EVP Program. There are no current projects or applications of GDLS incorporating technology relating to the EFV cold start heating functionality, and no emerging vehicle requirements that would utilize the cold start heating technology developed in connection with the EFV SDD-2 prototypes.  While Evans contends to the contrary, Infinity has not cited to any reliable evidence that GDLS used Infinity's information other than in connection with the EFV Program.  While working with Clayborn, GDLS issued three (3) purchase orders to Clayborn, totaling $21,593.51, which were fully paid to Clayborn upon delivery.  No other prospective vendors, other than Infinity and Clayborn, received payments from GDLS in connection with development of a heater to assist in the EFV's cold start functionality.

GDLS billed the Marines for research and development pertaining to the EFV on a cost plus fee basis for hourly work.  GDLS employees and/or contractors billed for work performed on the heating application – including the 2010 trade study – under certain charge codes and kept track of the amount of hours billed under these charge codes. GDLS employees and contractors billed hundreds of hours to the heating application.  Without Infinity's "know-how" and instruction on the design requirements of its custom heater project, the contract awarded to GDLS would have presented a failure to meet the objective requirements, against the agreed upon contractual obligations and deliverables. GDLS billed the Marines for work

performed in connection with Clayborn pertaining to the heating application as well as for work pertaining to the heater after GDLS ended its relationship with Infinity.

In its First Set of Interrogatories to Infinity, GDLS requested that Infinity identify and describe each alleged trade secret that Infinity contended was disclosed to GDLS, and to identify each document produced by Infinity in connection with this litigation which relates to each trade secret. In response to these Interrogatories, Infinity provided a list of documents it claims relate to each of its four claimed categories of trade secrets.  GDLS also requested that Infinity describe the damages it claims in this action.  In its Interrogatory Answers, Infinity's explanation of claimed damages pursuant to GDLS's alleged misappropriation of trade secret and confidential information consists of the following theory:  GDLS billed engineering hours to the Marines, and collected payment for its costs, margin, and incentive fees, while working on the EFV's cold start functionality, and that Infinity is entitled to the resulting profits. Infinity asserts that GDLS represented to the Marines that Infinity's technology was its own, and that but for Infinity's involvement, the EFV Program would not have continued and GDLS would not have been able to collect these fees. Also, in its Interrogatory Answers, Infinity indicated that it planned to offer expert testimony as to its damages. However, Infinity did not designate any experts on this issue and the time for doing so has expired. Infinity has estimated damages in excess of $232,000 associated with GDLS's profits from its billing of the Marines under the SDD-2 Contract, but has not provided any explanation for its calculation of these damages.

Additional facts relevant to the Court's analysis will be included below where appropriate.

## Summary Judgment Standard

Summary judgment shall be granted if the moving party shows, based on the materials in the record, "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986). An issue is "genuine" when the evidence is such that a reasonable factfinder could resolve the point in favor of the non-moving party. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1968). It can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. U.S.*, 352 F.Supp.2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 4). Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute. *See Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex*, 477 U.S. at 325). When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002).

## Discussion

Infinity has asserted a breach of contract claim against GDLS alleging that GDLS breached the PDA by disclosing and revealing to third parties Infinity's Proprietary Information

and by using Infinity's Proprietary Information for its own gain and to advance and support

GDLS's other business ventures.  Additionally, Infinity alleges that GDLS breached the terms of

the Purchase Orders by refusing to pay Infinity in full for the products and services specified

therein.  Infinity has also alleged that GDLS engaged in fraud, deceit and/or negligent

misrepresentation, was unjustly enriched and that its conduct violated Chapter 93A. GDLS first

asserts that the parties' entire relationship is subject to the terms of the PDA and Purchase Orders

and therefore, regardless of how Infinity has characterized its claims, they are governed by the

parties' contractual arrangements. GDLS then argues that it is entitled to summary judgment on

Infinity's claims because: (1) none of the information which Infinity disclosed constituted "trade

secrets" and, even if it did, any sharing of Infinity's Proprietary Information of was done in

accordance with the terms of the PDA, as expressly contemplated by the parties; and (2)  as to

Infinity's claims for failure to pay it in full for its products and services, Infinity has not

produced any additional purchase orders for such products/services, or any written modification

by GDLS to either Purchase Order pursuant to which GDLS agreed to compensate Infinity for

additional samples or equipment purportedly purchased by Infinity in connection with its effort

to sell GDLS a product for the EFV Program.

   Breach of Contract and Misappropriation of Trade Secrets: Sharing of Proprietary Information

       GDLS contends that Infinity's breach of contract and misappropriation of trade secrets

claims fail because Infinity cannot establish that: (i) any information it disclosed to GDLS in

connection with the EVF Program constituted a trade secret[4], (ii) GDLS breached its obligation

under the PDA by improperly disclosing Infinity's Proprietary Information; or (iii) GDLS

---

[4] There are disputed issues of material fact as to whether information which Infinity disclosed to GDLS constituted trade secrets; for purposes of this Memorandum of Decision I will assume that Infinity disclosed trade secrets and other confidential/proprietary information to GDLS.

improperly obtained or misused any information which it received from infinity.  GDLS further

contends that these claims must fail because Infinity has failed to establish that it has suffered

any damages.

<u>*Breach of the PDA*</u>

In order to state a claim for breach of contract, Infinity must establish that GDLS

disclosed its Proprietary Information in violation of its obligations under the PDA.  Under the

terms of the PDA, the receiving party was required to keep confidential only that information

provided by the disclosing party which was properly designated as "Proprietary Information" in

accordance with its terms.  There are three provisions of the PDA relevant to Infinity's claim: (1)

that each party would use the other's Proprietary Information solely for purposes of the EVF

Program; (2) that neither party would disclose or reveal the other's Proprietary Information, or

any notes, summaries or other information derived from the Proprietary Information, to any third

party without the disclosing party's prior written consent; and (3) that neither party would use

the disclosing's party's Proprietary Information for personal gain or to advance or support the

receiving party's other business ventures or the business ventures of others.  GDLS asserts that

there is no evidence which would support a finding that it disclosed any of Infinity's Proprietary

Information other than for use in the EVF Program.  I agree.  Moreover, there is no evidence that

GDLS utilized any of Infinity's Proprietary Information for personal gain or to advance or

support its own business ventures outside of the EVF Program. As to these claims, GDLS is

entitled to summary judgment.  There is evidence, however, which would support a finding that

GDLS did disclose Infinity's Proprietary Information to third-party vendors without Infinity's

written consent.  There is also a legal question which had not been adequately addressed by the

parties: whether it is a violation of the PDA for GDLS to use Infinity's Proprietary Information

to support the business venture of a third-party—even if the other company's business venture involved the EVP Program (in this case, Infinity asserts that GDLS shared its Proprietary Information with MLS, Clayborn, Temp Inc. and Dayton T. Brown).   For these reasons, I find that there is a genuine issue of material fact as to whether GDLS breached its obligations under the PDA regarding the disclosure of Infinity's Proprietary Information.

<u>*Misappropriation of Trade Secrets/Confidential Information*</u>

To establish a claim for misappropriation of its trade secrets, Infinity must prove "'(1) the information in question is a trade secret, (2) [it] took reasonable steps to preserve the secrecy of that information, and (3) [GDLS] used improper means, in breach of a confidential relationship, to acquire and use that trade secret.'". *Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137, 143 (D. Mass. 2006)(citation to quoted case omitted). Given that the PDA contemplated that Infinity disclose its proprietary information to GDLS, it is a close call as to whether there is sufficient evidence in the record to support a finding that GDLS has established the third prong of its claim, *i.e.*, that GDLS used *improper* means, in violation of the parties' confidential relationship, to obtain and use Infinity's trade secrets. Infinity has alleged that GDLS sought proprietary information from it *after* the termination of the Purchase Orders and then provided this information to third-party vendors, such as Clayborn, to use in their attempts to design a heater to solve the cold start problem.  I find that these allegations are sufficient to create a genuine issue of material fact with regard to this claim.

GDLS further asserts that if the Court denies its motion for summary judgment, Infinity's misappropriation of trade secrets claim must be limited to information it disclosed and properly designated as "proprietary" pursuant to the terms of the PDA. I disagree. While the failure to properly identify information as "proprietary" in accordance with the PDA is fatal to Infinity's

breach of contract claim against GDLS relating to the disclosure and/or misuse of any such

information[5], such failure is not necessarily fatal to Infinity's misappropriation of trade secrets

claim. *See Diomed, Inc.*, 417 F.Supp.2d at 145 (Massachusetts courts have recognized that

information not protected by express agreement may still be confidential for purposes of

misappropriation claim).

### *Whether Summary Judgment is warranted because Infinity has failed to Prove Damages*

Assuming that Infinity has otherwise established the elements of its claims for breach of

contract and misappropriation of trade secrets/confidential information, GDLS asserts that it is

entitled to summary judgment because Infinity has not established that it suffered any damages.

Infinity argues that after it terminated the Purchase Orders, GDLS continued to use its

Proprietary Information and other confidential information constituting trade secrets for its own

benefit: It billed the Marines for hours it worked continuing to utilize Infinity's technology and

for work performed by Clayborn that utilized Infinity's Proprietary Information.  Infinity's

theory is that GDLS was unjustly enriched by its misuse of Infinity's Proprietary information

which is compensable under the PDA.  In the alternative, Infinity argues that it is entitled to

nominal damages under Massachusetts law. Infinity cites Paragraph 14 of the PDA in support of

its assertion that it is entitled to money damages equal to the amount of money which GDLS

made utilizing its Proprietary Information. Paragraph 14 of the PDA provides that in the event of

a breach of any provision of the PDA, the "innocent" party shall "be entitled to seek injunctive

and/or other equitable relief."  Unjust enrichment is an equitable in nature and therefore,

conceivably, Infinity can seek such damages under Paragraph 14 for GDLS's alleged breach of

---

[5] To be clear, to the extent that I have found that Infinity's claim for disclosing its proprietary information in violation of the PDA survives, that claim is limited to the improper disclosure of "Proprietary Information," and any other information that the PDA expressly requires be kept confidential (such as notes, summaries or other information derived from Proprietary Information).

its obligation not to disclose Infinity's Proprietary Information.  For that reason, summary judgment is denied as to these claims.  However, I caution Infinity that I have grave doubts as to the viability of its unjust enrichment theory given that GDLS was expressly permitted to utilize Proprietary Information it obtained from Infinity in the EVF Program and therefore, is arguably entitled to retain amounts it billed the Marines for using Infinity's technology.  The Court will revisit this issue prior to trial. *See* note 7, *infra.*

Breach of Contract: Failure to Pay for Products and Services

Infinity asserts that GDLS breached the terms of the PDA and/or the Purchase Orders by failing to pay in full for products produced and services provided by Infinity.  GDLS argues that the parties' relationship is governed by the terms of the PDA and Purchase Orders and that Infinity was fully compensated in accordance with the terms of those documents.[6]

Infinity alleges that in 2008 and 2009, Infinity presented GDLS with quotations for the engineering design and manufacture of heaters capable of meeting the EFV Program's cold-start requirement. Thereafter, GDLS issued two Purchase Orders to Infinity: the first, Purchase Order #40034755, was for seven of Infinity's heater assembly units at a price of $6,840 each, and the second, Purchase Oder #40055319, was for two Central Axis Inline prototype heater units. Infinity was paid in full for the two prototype heater which were ordered pursuant to Purchase Order #40055319 (these heaters were delivered to GDLS, but did not work satisfactorily), but was not paid anything for the seven prototypes ordered pursuant to Purchase Order #40034755 . Purchase Order #40034755GDLS was revised to include a one-time $38, 679 charge for machinery and tools, which GDLS paid in full.  GDLS did not issue any other written

---

[6] I find that the PDA essentially governs the parties' obligations *vis a vis* the exchange of Proprietary Information, while the Purchase Orders govern the terms of the products and services to be provided by Infinity and the amount that infinity was to be paid for those goods and services.

modifications to either of Purchase Orders agreeing to compensate Infinity for additional samples or equipment purportedly purchased by it.

In it memorandum in opposition to GDLS's motion, Infinity states that the particular work for which it seek reimbursement relates to GDLS's failure to reimburse it for work it did on seven prototypes. Infinity's argument on this issue is vague and confusing—the Court will do its best to state its understanding of Infinity's allegations.  Infinity appears to be arguing that under the terms of Purchase Order #4003475, it should have been reimbursed for work and research done on the seven prototypes because the order was cancelled due to a *subcontractor's* inability to "bend" the heaters. Infinity takes the position that GDLS had provided it with names of vendors who could bend the heaters and therefore, the bending of the heaters was the responsibility of third parties.  GDLS's argues that it terminated the Purchase Order as the result Infinity's failure to deliver a workable prototype, which constituted a default thereunder.  GDLS further argues that even if Infinity's failure to deliver a workable prototype could be attributable a third-party vendor's inability to bend the heater, the Terms and Conditions of Purchase Order #40034755 do not provide Infinity with a right to payment.  In support of its position, GDLS cites to Paragraph 19 of the Terms and Conditions.

The Terms and Conditions do not provide for reimbursement to Infinity for work done in the event its failure to deliver a workable prototype was caused by a subcontractor.  On the contrary, Purchase Order #40034755 sets out the conditions under which *Infinity would not be liable to GDLS* if its default is caused by a subcontractor. *See* Terms and Conditions, at 19(c). In support of its position that upon cancellation of the work order GDLS was required to negotiate to reach a fair value for work performed, Infinity cites generally to multiple pages of the Terms and Conditions *without citing to a specific provision*. It is not the Court's job to sift through the

evidence to find support for a party's claim.  The Court has nonetheless reviewed the cited pages

in an attempt to find applicable language to support Infinity's contention.  The only such

provision is Paragraph 20 of the Terms and Conditions: Termination for Convenience.  However,

Infinity does not assert that the work was terminated for convenience, rather it argues that it was

termination was caused by a subcontractor's failure. Since under the Terms and Conditions

Infinity is not entitled to reimbursement where the work was terminated for failure to deliver a

workable product regardless of whether the failure is caused by a subcontractor, GDLS is

entitled to summary judgment on this claim.

<u>Infinity's Fraudulent Misrepresentation Claim</u>

Infinity has asserted a claim against GDLS for fraudulent misrepresentation based on: (i)

GLDS negligently or fraudulently represented its intent to use Infinity's confidential information

as provided under the PDA; (ii) GDLS's negligent or fraudulent misrepresentation that it was

still considering using Infinity as a vendor when it visited Infinity's in the September and

October 2009and "collected more trade secrets"; and (iii) GDLS negligently or fraudulently

represented that it would compensate Infinity for work performed outside the Purchase Orders.

To recover on its fraudulent misrepresentation claims, Infinity must establish that GDLS

"made a false representation of material fact, with knowledge of its falsity, for the purpose of

inducing [Infinity] to act on this representation, that [Infinity] reasonably relied on the

representation as true, and that [Infinity] acted upon it to [its] damage. Unlike fraud, negligent

misrepresentation does not require an intent to deceive or actual knowledge that a statement is

false."  *Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 471–72, 918 N.E.2d

36, 47–48 (2009).

Little discussion is warranted with respect to Infinity's misrepresentation claims alleging that GDLS negligently or fraudulently represented its intent to use Infinity's confidential information in accordance with PDA.  Infinity has not pointed to any statements made by any GLDS employee that GDLS would use Infinity's confidential information in accordance with the terms of the PDA.  Instead, Infinity relies on representations made by GDLS in the PDA itself. Infinity does not assert that GDLS fraudulently or negligently made such representations *at the time it signed the PDA*, rather it argues that after termination their relationship, GDLS violated the PDA by continuing to utilize Infinity's technology and by sharing its confidential information and trade secrets with competitors.  While such allegations may state a claim for breach of the PDA, as a matter of law, they do not support a fraudulent or negligent misrepresentation claim. Little also need be said regarding GDLS's failure to compensate Infinity for worked performed outside of the Purchase Orders. In its statement of facts, Infinity asserts that it did work and purchased equipment outside the scope of the Purchase Orders because it believed it would be paid based on promises and statements of GDLS employees. However, none of the evidence cited by Infinity supports its contention that any employee of GDLS told Infinity that it would be compensated for work performed outside the Purchase Orders.   On the contrary, it is clear that Evans' performed the work based on *his* assumption that he was going to get paid (basically, because he wouldn't do the work without getting paid).   For that reason, GDLS's motion for summary judgement is granted with respect to Infinity's fraudulent and negligent misrepresentation claims.

<u>Unjust Enrichment</u>

Under Massachusetts law, unjust enrichment is the "retention of money or property of another against the fundamental principles of justice or equity and good conscience.' To succeed

on a claim for unjust enrichment, a plaintiff must show (1) a benefit conferred upon defendant by

plaintiff, (2) an appreciation or knowledge by defendant of the benefit, and (3) that acceptance or

retention of the benefit under the circumstances would be inequitable without payment for its

value." *Biltcliffe v. CitiMortgage, Inc.*, 952 F. Supp. 2d 371, 380 (D. Mass. 2013), *aff'd,* 772 F.3d

925 (1st Cir. 2014)(internal citation and citation to quoted case omitted).  GDLS asserts that it is

entitled to summary judgment on this claim because the parties' relationship is governed by the

PDA and Purchase Orders.

I agree with GDLS, to an extent: "[U]njust enrichment is 'an equitable remedy, and it is a

basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving

party has an adequate remedy at law.'". *Id.* (citation to quoted case omitted). To the extent that

Infinity is seeking the same damages on its unjust enrichment claim as it seeks for its breach of

contract claim, GDLS is entitled to summary judgment with respect to Infinity's *independent*

cause of action for unjust enrichment.[7]  To the extent that Infinity is asserting a claim for unjust

enrichment distinguishable from its breach of contract claim, summary judgment is denied.

Chapter 93A

In its memorandum is support of its motion for summary judgment, GDLS essentially

argued that Infinity's Chapter 93A claims fail for the same reasons that its other claims fail: the

parties' relationship is governed by the PDA and Purchase Orders, Infinity has failed to establish

that GDLS violated its obligations under those documents and since Infinity's Chapter 93A

claims are derivative of its other failed claims, the Chapter 93A claims fail as well. However,

GDLS provide little to no legal or factual argument.   In its *reply* memorandum, GDLS asserts

for the first time that it is entitled to summary judgment under new legal theories (the Purchase

---

[7] Prior to trial, I will allow the parties to provide further briefing as to whether the PDA allows Infinity to recover damages based on an unjust enrichment theory.

Orders' choice of law provisions preclude Infinity from brining a Chapter 93A claim).  Under these circumstances, I am denying GDLS's motion for summary judgment on Infinity's Chapter 93A claims.  That being said, I agree with GDLS that as pled, Infinity's Chapter 93A claims are largely (if not entirely) derivative of its other claims and, based on my rulings, the scope of Infinity's Chapter 93A claims has been significantly narrowed.  Therefore, prior to trial, the parties will be given an opportunity to file motions and fully brief whether Infinity's Chapter 93A claims remain viable.

## Conclusion

Defendant's Motion For Summary Judgment (Docket No. 118) is ***granted*** and ***denied*** in part, as provided in this Memorandum of Decision.

**SO ORDERED.**

**/s/ *Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**